CHARLES E. QUINCY & Co. ARBITRAGE CORPORATION, Plaintiff, v. CITIES SERVICE COMPANY, Defendant.

Supreme Court, New York County, June 29, 1935.

*Harold R. Zeamans* [*Benjamin Miller* of counsel], for the plaintiff.

*Frueauff, Robinson & Sloan* [*John W. Davis, Edgar G. Crossman, Joseph A. Burdeau* and *Francis W. Phillips* of counsel], for the defendant.

ROSENMAN, J.   On October 10, 1929, the defendant sent the following letter to its common stockholders:

" *To the Holders of Common Stock:*

"At the meeting held today the Board of Directors of your corporation authorized the issue and sale of additional shares of its common stock for the purpose of providing funds for new construction and additions to the properties of its subsidiary companies and for other corporate purposes.

"Accordingly the Corporation hereby offers to its Common stockholders shares of its Common capital stock at the price of $45.00 per share, payable in cash on or before November 30, 1929.

" Each holder of record of Common stock issued and outstanding at the close of business on November 7, 1929, will be entitled to subscribe for additional shares of common stock of the Corporation in the proportion of one share of such stock for each ten shares issued and outstanding then registered in the holder's name as shown by the books of the Corporation.

" The period for this subscription privilege will expire at the close of business on November 30th, 1929.

"As soon as practicable after November 7, 1929, warrants will be mailed to each Common stockholder specifying the number of shares and/or fractions of shares of common stock to which such holder is entitled to subscribe under this offer.

" The Rights evidenced by warrants will be transferable by assignment, duly executed in the form printed thereon.

" Warrants not used in making subscriptions before the close of business November 30th, 1929, will be void and of no value.

" The rights may be exercised as a whole or in part, by executing the subscription agreement in the form provided on the warrants and delivering the same with full payment at the rate of $45 per share to Depositaries designated for that purpose, before the close of business on November 30, 1929.   Payment must be made by check, draft or money order payable to the order of Cities Service Company.   For your convenience in making such payments Cities Service Company will arrange for Depositaries in the cities where the company has established Transfer Agencies, and you will be advised the names of such Depositaries in the instructions which will be mailed with the warrants.

" In the absence of contrary instructions to the Depositaries, deliveries will be made of full shares only. To the extent that stockholders are entitled to shares of fractional amounts, these will be delivered to Henry L. Doherty & Company, who will retain the same for the stockholders and consolidate them in full shares, thereby making them bear dividends, which dividends will be prorated to stockholders for the account of whom such fractions are so retained, all in accordance with the practice with which you are familiar.

" Shares purchased by the exercise of Rights will be delivered as soon as practicable after November 30, 1929, and the first dividend payable thereon will be the January 1, 1930 dividend."

The market value of the stock of the defendant on that day was about sixty-six dollars per share.

On October 14, 1929, the defendant published the following advertisement:

" *To the holders of the Non-Detachable Common Stock Purchase Warrants attached to the Cities Service Company 5% Gold Debentures due 1969:*

" Cities Service Company is offering to each Common Stockholder of record November 7, 1929, the right to purchase one share of Common Stock at $45 per share for each ten shares registered in his name.

" Under the terms of the Indenture dated March 1, 1929, between Cities Service Company and The Equitable Trust Company of New York, under which the above Debentures and Stock Purchase Warrants were issued, the holders may exercise their Warrants by presenting them, and thirty days thereafter must pay for the shares of common stock called for by the Warrants. Thus they do not become stockholders of record until thirty days after the presentation of their Warrants.

" In this instance, however, holders of the above Debentures are afforded the opportunity of becoming stockholders of record, through the exercise of the Warrants, without waiting for the expiration of the thirty day period after presentation of the Warrants, as provided therein. Accordingly, a holder of the above Debentures, if he desires to take advantage of this offer, may present his Warrant at any time between October 15, 1929, and the close of business on November 4th, 1929, and accompany such presentation by payment in cash for the shares of Common Stock called for by the Warrant; and thereupon, upon such presentation and payment, he will become a stockholder of record by November 7, 1929, so that he will be entitled to exercise the Rights being offered to Common stockholders.

" However, the shares issued through such exercise of the Stock Purchase Warrants will not be delivered until thirty days after the presentation of the Stock Purchase Warrants, but Debenture Holders will receive the right to subscribe for the new stock and will also receive the December 1, 1929, dividend on the stock issued through the exercise of their Debenture Stock Purchase Warrants."

After October 10, 1929, and until October 30, 1929, the so-called " rights " to subscribe for additional shares of common stock of the defendant were bought and sold on the New York Curb Market on a " when, as and if issued " basis, at a price of from one dollar and fifty cents to two dollars and twenty-five cents per " right."

Plaintiff, in reliance on this advertisement, on October 14, 1929, purchased ninety of the five per cent gold debentures of the defendant referred to in the advertisement, with the purchase warrants attached. On the next day it purchased eighteen more. The total cost of these 108 bonds was $237,600, or $220 per bond.

On October 16 and 17, 1929, the plaintiff deposited with the defendant the stock purchase warrants which had been attached to these debentures, and also the sum of $136,080, which was the amount necessary to subscribe for 4,320 shares of the common stock of the defendant at $31.50 per share, under the provisions of the stock purchase warrants.

Plaintiff then sold the bonds without the warrants for $87,651.80. Plaintiff was an arbitrage company and was handling this as an arbitrage transaction. The arbitrage was the purchase of the bonds with warrants, selling the bonds ex-warrants, exercising the option contained in the warrants by purchase of the stock and rights under the terms of the advertisement, and selling eleven rights on an " as, if and when issued basis " for each share of stock with right purchased.

During October, 1929, the stock market crash occurred. There was a sudden decline in the prices of all securities, including the common stock of the defendant. On October 30, 1929, the price of the stock had sunk to thirty-two dollars per share. The directors of the defendant, at a meeting on October 30, 1929, decided to and did cancel the proposal and announcement contained in the communications of October tenth and October fourteenth.

Before the holding of the directors meeting on October 30, 1929, the plaintiff sent a written notice to the defendant stating that it objected to the cancellation of the rights under the terms of their advertisement; that the plaintiff insisted on receiving that for which it had paid; and that it would hold the defendant responsible both at law and in equity for the result of a refusal. Despite this notice,

the directors of the defendant rescinded their action with respect to the rights referred to in the advertisement. The plaintiff knew of this action on that date.

On November 13, 1929, at the request of the plaintiff, the defendant delivered the 4,320 shares of stock to which the plaintiff was entitled by virtue of the deposit by it of the sums of money referred to and the warrants. No rights, of course, were delivered.

During the period from November 19, 1929, to December 12, 1929, the plaintiff sold all of the shares of stock received by it at an average price of $30 per share, or a total of $129,600.

The plaintiff received and retained the December, 1929, dividend upon the 4,320 shares of stock, totaling $110.10 in cash and 22.02 shares of common stock.

Plaintiff gave no notice of rescission and did not offer to surrender the stock or the bonds or the dividends received until December 28, 1931. On that date a written notice of rescission and offer to surrender the property was sent by the plaintiff's attorneys to the defendant. This action was commenced on February 4, 1932.

During the period from November 13, 1929, when the stock was delivered to plaintiff's agent, to December 28, 1931, when notice of rescission was given, the market price of the stock fluctuated. The stock never reached the price of forty-five dollars per share after October 26, 1929. Its highest price was forty-four and one-eighth dollars per share on October 31, 1929, and it had declined to five dollars per share in December, 1931. It is now selling for about one dollar and fifty cents. During the period from November 7, 1929, to November 30, 1929, when the stockholders were to have been given the right to purchase additional shares at forty-five dollars per share, the stock never sold for more than thirty-two dollars, the average price being about thirty dollars.

The stock purchase warrants annexed to the five per cent gold debentures due 1969 (the type of debentures plaintiff purchased) expired by their terms on March 1, 1932, so they had no value after that date.

The stock warrants read as follows, in part:

" This warrant becomes void if detached from the attached debenture or if not exercised on or before March 1, 1932 or the date of previous redemption of the attached debenture.

" CITIES SERVICE COMPANY

" Non-Detachable Common Stock Purchase Warrant

" No.                                                40 Shares

" For value received, Cities Service Company, a Delaware corporation (hereinafter called the ' company '), thirty days after

the surrender of this Warrant for exercise at the office or agency of the Company in the Borough of Manhattan, The City of New York, on or before March 1, 1932, will issue, sell and deliver, or cause to be sold and delivered to the bearer of the attached Debenture or if it be registered to the registered owner thereof (subject to the provisions of the Indenture with reference to recapitalization stock dividends, offering of rights to subscribe, successor corporations, and amendments of the Indenture) a certificate for forty full paid and non-assessable shares of the common stock of the Company without par value upon payment therefor by the bearer of the attached Debenture, or if it be registered by the registered owner thereof in New York funds at the time of delivery of said shares of the aggregate purchase price thereof as follows: * * *. Upon the exercise of this Warrant the form of election on the back hereof must be duly executed with instructions for registration and this Warrant must be presented attached to the 5% Gold Debenture due 1969 of the Company bearing the same serial number as this Warrant and shall be detached and cancelled by the Company. If otherwise detached or if not exercised on or before March 1, 1932, this Warrant shall become void and all rights hereunder shall thereafter cease. The purchase right evidenced by this Warrant can be exercised only as an entirety."

The plaintiff claims that the advertisement of October 14, 1930, was an offer to debenture holders, which was to this effect: " If you deposit your stock warrants now and pay the full price for the stock now, although you are not obliged to make such payment until thirty days later, the defendant will deliver your stock to you thirty days thereafter and see to it that you receive the rights to subscribe to additional stock at $45 per share." The plaintiff claims that it accepted this offer by depositing the stock warrants and cash; that a unilateral contract then came into existence by which the defendant was bound to deliver the agreed number of rights to the plaintiff; that upon the failure of the defendant to do so the plaintiff had a right to and did rescind the contract; that it now offers to return to the defendant 108 bonds ex-warrants and the 4,320 shares of the common stock, and demands that the defendant return to it the sum of $136,080 which it paid the defendant, and 108 debenture bonds with common stock warrants attached, with an appropriate accounting on both sides of interest and dividends. Plaintiff also claimed at the trial that if its right to rescission is not established, that it recover as an alternative the damages it sustained.

The defendant denies that there was any contract. It also sets up the affirmative defenses of ratification and laches.

The plaintiff's cause of action here asserted is based entirely upon an alleged contract. No contract came into existence.

The letter of October 10, 1929, and the advertisement of October 14, 1929, were addressed to stockholders and debenture holders on the respective dates. Plaintiff belonged to neither class on those dates. Defendant claims that the letters were merely announcements of an intention on its part to make an offer to stockholders on November 7, 1929, merely statements of what the company expected to do on that day, and a bit of advice to bondholders that they might also qualify as stockholders because the defendant was going to waive the thirty-day requirement in the stock warrants. It is not necessary to go so far.

They were, at the most, offers. The letter of October tenth was an offer to a class of persons comprised of those whose names would be on the defendant's books as stockholders of record on November 7, 1929. It was an offer that if those persons would subscribe for additional shares at the ratio of one share for every ten, at any time up to November thirtieth on forms to be sent out by the defendant after November seventh, and pay for them at the prescribed price, the defendant would deliver the shares as soon as practicable after that date.

The advertisement of October fourteenth waived the thirty-day provision of the stock warrant, and permitted any debenture holder to become a stockholder of record on November 7, 1929, by presenting his warrants and paying the prescribed price for the stock between October fifteenth and November fourth. The procedure would permit bondholders to become members of the class to which the letter of October 10, 1929, was addressed and to become such a member in time to accept the offer being made to them by doing the prescribed things on and after November 7, 1929.

The plaintiff decided to qualify as a member of the class before November 7, 1929. It might have done so by buying some stock directly. It chose a different method. It bought bonds, detached the warrants, deposited the warrants and money and received stock. As an arbitrage company, it had adequate reason, founded in the profit motive, to pursue this course. But no greater rights were obtained by it than if it had made a direct purchase of stock. The end attained, not the means pursued, was the important item. The plaintiff's rights were to spring from his status as a stockholder, and not from the method by which he chose to become one. The offer had been made to all stockholders who might qualify on November seventh by any method. The method adopted by the plaintiff had not been singled out for preferential treatment.

On October 30, 1929, the offer of the defendant was revoked. It was revoked before the plaintiff or any stockholder accepted it or could possibly have accepted it.

The acts of acceptance could not occur until after November seventh. Until that time defendant had full legal right to revoke its offer. It was an offer looking to the formation of a unilateral contract. The contract was to be complete when full performance on the part of the offeree had been furnished. Partial performance, change of position by the offeree, loss or detriment to the offeree — none of these will suffice. Only complete performance will transform the offer into a contract. Until then the offer may be revoked at will and the offeree is without remedy. (*Petterson* v. *Pattberg*, 248 N. Y. 86; *Sonino* v. *Magrini*, 225 App. Div. 536; 1 Williston Cont. §§ 60, 60-b.) Here the offer was withdrawn on October 30, 1929, and the plaintiff knew it.

Plaintiff cites section 45 of the Restatement of the Law of Contracts, which lays down a rule contrary to the one here followed. In so far as it states that a unilateral contract is definitely created by part performance in response to an offer, subject to later full performance within the time set out in the offer, or if there be no such time, then within a reasonable time — it has not been adopted by the New York courts.

With this conclusion that no contract existed, the plaintiff's claim must necessarily be rejected.

Even were there such a contract, however, when the stock warrants and cash were deposited with the defendant, as urged by the plaintiff, the plaintiff would still be barred from the remedy sought.

With full knowledge of the action of the directors on October 30, 1929, he received and accepted the stock of the defendant on November 13, 1929, without the rights to which he claims he was entitled. He received and accepted a dividend on it. Shortly thereafter he sold the stock. Not for two years did the plaintiff give notice of rescission and offer restitution. During this time the stock had fluctuated from forty-four dollars to five dollars per share.

Equity will not permit the plaintiff to rescind now, long after knowledge of the fact which is claimed to be the cause for the rescission and after the value of the article purchased has so greatly depreciated in value. As was stated in the case of *Little & Ives Co.* v. *Lamb Publishing Co.* (108 Misc. 14, 19): " In order to recover upon the theory of rescission a party is required to act promptly upon discovery of the ground for rescission and to give notice of an intention to rescind and to restore benefits received so that the other party may be placed *in statu quo*. If he expressly affirms the contract or does acts inconsistent with disaffirmance, the right to

rescission is lost.   *Knickerbocker Trust Co.* v. *O'Rourke Engineering Constr. Co.*, 124 App. Div. 210; affd., 196 N. Y. 509.   He cannot lie by and speculate whether to disaffirm or to allow the contract to stand.   He cannot be permitted to rescind after the course of events has demonstrated that disaffirmance is the better policy.   *Hallahan* v. *Webber*, 7 App. Div. 122."   (See, also, *Cobb* v. *Hatfield*, 46 N. Y. 533; *Shiverick* v. *Bonsall*, 185 App. Div. 338, 345; *Hallahan* v. *Webber*, 7 id. 122; *Grymes* v. *Sanders*, 93 U. S. 55, 62.)

There is no estoppel *in pais* in this case, as is urged by the plaintiff. There was no representation or admission of fact by the defendant. It was a representation of future action or willingness to act.   The defendant here is not seeking to deny the truth of a former admission, as in the case of *Town of Brookhaven* v. *Smith* (118 N. Y. 634), relied on by the plaintiff.   Nor was it a representation by the defendant in reliance on which the plaintiff abandoned an existing right, as in *Witherell* v. *Kelly* (195 App. Div. 227), also relied on by plaintiff.

The doctrine of promissory estoppel, cited by the plaintiff from section 90 of the Restatement of the Law of Contracts, has been definitely limited in this State to cases involving charitable subscriptions.   (*Allegheny College* v. *National Chautauqua County Bank*, 246 N. Y. 369.)

Professor Williston in his discussion of promissory estoppel, as related to promises other than charitable subscriptions, says (Williston Cont. § 139): " Promises of future action, it is generally held, if they can furnish the basis for an estoppel at all, can do so only where they relate to an intended abandonment of an existing right, and are made to influence others who in fact are induced to act thereby. * * * In these cases, however, no new right is created.   The court does not sustain an action on the promise; it reaches the desired result by allowing a defence to an action or allowing an original right to be enforced by merely prohibiting the interposition of a defence. They properly fall under the head of waiver, giving that word the narrow significance hereafter ascribed to it."

In view of the conclusions that no contract ever came into being, and that if it had, the conduct of the plaintiff has barred it from equitable relief, judgment is directed for defendant.   Settle findings and conclusions and judgment not later than noon, July 3, 1935.